IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **DIVERSIFIED SOLUTIONS, INC.** | § | **CASE NO. 14-10069** |
|    Debtor | § | **Chapter 11** |
| | § | |

**MEMORANDUM OF GARNET ANALYTICS, INC. IN FURTHER SUPPORT
OF MOTION TO APPROVE COMPROMISE**

Garnet Analytics, Inc. ("GAI") respectfully submits this Memorandum, along with the attached Affidavit of its President, Denise T. Plude ("Plude Affidavit"), in further support of the "Amended Expedited Motion to Approve Compromise with Garnet Analytics under Rule 9019" (doc. 79, Apr. 11, 2014). This Memorandum and the accompanying affidavit elaborate on factors that support approval of the proposed compromise, both as a matter of the substantive Connecticut law that governs GAI's claims and affects the judgment potential, and in terms of the underlying facts GAI would prove at trial.

## INTRODUCTION

1.    The Court is by now well aware of the related lawsuit in the United States District Court for the District of Connecticut, *Garnet Analytics, Inc. v. Diversified Solutions, et al.*, Civ. No. 3:12CV716 (WWE) ("Connecticut Action"). GAI has previously summarized the claims at issue in that action and its history to date. See "Motion of Garnet Analytics, Inc. for Relief from the Automatic Stay to Continue Connecticut Federal District Court Action" (doc. 27, Jan. 29, 2014) ("Lift Stay Motion"), ¶¶ 3-33. In the interests of brevity, GAI incorporates that summary by reference in its entirety as if fully set forth here.

McKool 985420v2

2. The Court is also aware that in support of the Lift Stay Motion, exhibits GAI-1 to GAI-30 were admitted into evidence. Again in the interest of brevity, GAI will refer to those exhibits as appropriate rather than burden the Court with duplicates.

3. The attached *Declaration of Denise T. Plude under 28 U.S.C. §1746* ("Plude Affidavit") elaborates on and provides additional evidentiary support for certain limited aspects of the record. GAI will refer to specific portions of this affidavit as needed below. As a threshold matter, however, the affidavit begins with Mrs. Plude's sworn statement verifying that she has personal knowledge of the allegations stated in GAI's Complaint in the Connecticut Action and that those allegations are true and correct. See Plude Affidavit, ¶ 3. Because that Complaint was entered into evidence as Exhibit GAI-2 at a hearing in this matter on March 31, 2014, the following discussion will refer to the Complaint by that exhibit reference.

## LEGAL STANDARD

4. In determining whether to approve a settlement or compromise under Fed. R. Bankr. P. 9019, a bankruptcy court should consider the following five factors: "1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection; (3) the paramount interest of the creditors and a proper deference to their respective views; (4) the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and (5) all other factors bearing on the wisdom of the compromise." *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (addressing standard for approving compromise of estate's claims). *Compare Matter of Cajun Electric PowerCo-Op, Inc.*, 119 F.3d 349, 356 (5th Cir. 1997) (listing

McKool 985420v2

factors 1, 2 and 5 of those cited in *Moore* for settlement of competing claims of creditors and debtor).

     5.    **As to the probability of success**, it is well-settled that a Bankruptcy Court is not obliged to conduct a mini-trial on the merits. *Matter of Cajun Electric PowerCo-Op, Inc.*, 119 F.3d 349, 356 (5th Cir. 1997). In this case, however, the Court has the benefit of two rulings issued in the District of Connecticut after extensive evidentiary hearings on GAI's application for prejudgment remedy. These rulings are already in evidence in the record of this proceeding as Exhibits GAI-4 and GAI-7.

     6.    GAI has elsewhere summarized the District Court's PJR findings, reached after eight full days of hearings – in brief, there was a contract between GAI and DSI; DSI used GAI's work product without compensation and provided it to a replacement service provider that plagiarized it; defendants made knowingly false representations of fact with the intent that GAI would rely on them, including failure to disclose discounts that had the result of decreasing GAI's compensation; the reasons defendants gave for terminating the relationship with GAI in the spring of 2012 were pretexts to avoid paying GAI; and defendants' conduct reflected lack of good faith and willful disregard of GAI's rights in violation of the Connecticut Unfair Trade Practices Act. *See* Lift Stay Motion, ¶¶ 11-13; *see generally* Exhibits GAI-4 and GAI-7. These rulings alone support a conclusion that the claims to be compromised enjoy a probability of success more than sufficient to validate the exercise of business judgment to enter into a settlement.

     7.    The probability of success is particularly strong in light of the evidence that DSI Vice President Brian Sol engaged in active contract negotiations with GAI President Denise T. Plude culminating in a detailed letter agreement between the two companies in April 2010.

3

Emails documenting the negotiations, including Mr. Sol's multiple express acknowledgments of a relationship with GAI, have previously been introduced into evidence as Exhibit GAI-29 at the hearing in this proceeding on March 31, 2014. The core of the arrangement was that GAI would be paid based on hourly rates, with total compensation capped at 20% of what DSI received from its clients. *See also* Plude Affidavit ¶¶ 4-6. These documents, coupled with an unbroken two-year course of performance, billing and payment in accordance with the negotiated written statement of terms, provide ample grounds to sustain liability on a breach of contract theory. Indeed, they approach the threshold necessary to sustain summary judgment under Rule 56.

8. The same evidence that supports a finding for GAI on the contract question works against DSI in multiple dimensions. Most obviously – and as the Amended PJR Ruling explicitly held – the defendants' untenable attempts to avoid a contract personally negotiated by DSI's Vice President expose the pretextual nature of their purported justification for terminating the relationship.

9. For purposes of evaluating probability of success, GAI would stress that Mrs. Plude has personal knowledge of the facts alleged in GAI's Complaint and her affidavit verifies the truth and correctness of the allegations. *See* Plude Affidavit ¶ 3; *see generally* Complaint (Exhibit GAI-2) *passim*.

10. GAI would also stress that because GAI's claims depend on whether GAI actually put enough time into the work to hit the 20% cap, *all material evidence on this crucial subject is exclusively in GAI's control.* Thus, while it is technically possible for DSI to challenge GAI's evidence on the basis of credibility or internal inconsistency, *DSI will never have contrary proof.*

11. The best practical illustration of this problem is that in eight days of evidentiary hearings on GAI's PJR application, the defense never raised any material challenge to any time

4

claimed by GAI. Indeed, given the importance of this evidence in the case, the District Court expressly noted in the first PJR Ruling that Mrs. Plude "had given detailed evidence about the time spent working on specific projects for defendants" but "none of the specific time entries was discussed or challenged on cross-examination." "Ruling on Plaintiff's Application for Prejudgment Remedy" (Exhibit GAI-04), at 5. Despite this warning, the defense never came forward with any challenge to GAI's time evidence.

12. The PJR record and rulings fairly reflect the problems that lack of access to evidence presents for the defense. Without contrary evidence, the defense has no way to refute GAI's time claims. For the same reason, it is virtually impossible for the defense to justify the purported "concerns about billing" that were raised in connection with termination in April 2012. The lack of such justification led the District Court to deem those concerns pretextual, leading in turn to findings adverse to the defense about good faith and unfair trade practices.

13. Probability of success includes verdict or liability potential.

14. In its Amended PJR Ruling issued on December 12, 2013 (Exhibit GAI-7), the District Court found probable cause to believe that a verdict would be rendered in favor of GAI in a net amount of $2,188,498.70. Significantly, this total included only actual damages, attorneys' fees and costs, and simple interest at 10%. In awarding fees and costs, the Court relied on the contract and the Connecticut Unfair Trade Practices Act, which allows for "costs and reasonable attorneys' fees," *see* CONN. GEN. STAT. § 42-110g(d); in awarding interest, the Court used a Connecticut statute that allows for interest "as damages for the detention of money after it becomes payable," CONN. GEN. STAT. § 37-3a. *See* Amended PJR Ruling, Exhibit GAI-7, at 18-21.

5

15. The Amended PJR Ruling can reasonably be viewed as the low end of a range of possible outcomes in the event of a plaintiff's verdict in the Connecticut litigation.

16. The District Court declined to reach GAI's argument that defendants should be denied the benefit of certain discounts DSI extended to its customers but failed to disclose to GAI, in breach of a contract provision expressly negotiated between Mr. Sol and Mrs. Plude that required DSI to make such disclosure. *See* Amended PJR Ruling (Exhibit GAI-7) at 7. This reduced the award for one category of actual damages from $1,095,452.77 (*see* initial PJR ruling, Exhibit GAI-4 at 10), or about $400,000. At a full trial on the merits, GAI would argue that DSI's breach of the disclosure obligation bars it from relying on undisclosed discounts.

17. The written statement of terms negotiated by Mr. Sol and Mrs. Plude in 2010 provides for interest on unpaid fees at 1% per month or 12% per year. A copy of this iteration of the statement is appended to GAI's Complaint in the Connecticut Action, which is Exhbit GAI-2 in this proceeding. The 10% interest rate applied in the Amended PJR Ruling is thus approximately $65,000 to defendants' benefit.

18. Separate from the rate question, GAI would contend that a full interest award should consist of two distinct components: (a) contract interest, accruing at the contract rate of 1% per month and increasing proportionally from month to month since breach in April 2012, and (b) statutory interest on the amount due under the contract, including interest, on the basis that the entire unpaid amount due under the contract, including accruing interest, is under "detention … after it becomes due." A full interest award would be increased by these calculations.

6

19. The sum of these adjustments, with further adjustment for interest on the increased total, would increase the damage elements included in the Amended PJR Ruling by approximately $500,000, for a total approaching $2,700,000.

20. This verdict potential does not include punitive damages even though the Amended PJR Ruling concluded that defendants violated the Connecticut Unfair Trade Practices Act.

21. CUTPA provides for the award of punitive damages in the discretion of the Court. *See* CONN. GEN. STAT. § 42-110g(a). The statute imposes few limits on the exercise of that discretion. Connecticut decisions have affirmed awards that treble actual damages, *see, e.g., Ulbrich v. Groth,* 310 Conn. 375, 445-457 (2013). The Connecticut Supreme Court has even affirmed an arbitral award of $5 million in punitive damages despite the lack of *any* compensatory damages, holding that the award was not clearly contrary to the public policy of the state. *MedValUSA Health Programs, Inc. v. MemberWorks, Inc.* 273 Conn. 634, 654-64, *cert denied*, 546 U.S. 960 (2005).

22. The appropriateness of a punitive award under CUTPA depends, among other things, on the relative blameworthiness of the parties including whether the defendants' conduct was reckless, intentional or malicious, whether the defendants acted for their own profit, and whether their wrongdoing was hard to detect. *Ulbrich*, 310 Conn. at 454-55.

23. The District Court's findings regarding the defendants' conduct in this case meet these criteria. *See* Amended PJR Ruling (Exhibit GAI-7), at 11 ("evidence supports probable cause finding that defendants made false representations as a statement of tact; the representations were untrue and known to be untrue by the party making them; the representations were made to induce Garnet to act upon them; and Garnet acted upon them to its

7

injury"); *id.*at 16 (finding probable cause as to CUTPA liability based on "defendants' lack of good faith and willful disregard of Garnet's rights; defendants' failure to disclose DSI's rate structure despite numerous requests; defendants' appropriation of Garnet's work product and DSI's prolonged refusal to pay on pretextual grounds").

24. A punitive award equal to only twice the amount of the Amended PJR Ruling, without the additional adjustments discussed above, would bring the verdict potential into the range of $6.6 million. With the additional adjustments discussed above, a base verdict in the range of $2.7 million plus punitive double damages would support a total verdict in the range of $8.1 million.

25. The verdict potential in this case extends further still because GAI filed an "offer of compromise" under Connecticut law on February 22, 2013. Under CONN. GEN. STAT. § 52-192a, such an offer may be accepted on its terms at any time within thirty days of notice of filing. The power of acceptance lapses thereafter. At the conclusion of the action, the court inspects the record and, if the final judgment exceeds the offer, the defendants are liable for interest at a statutory rate of 8%. If the offer is filed within eighteen months of the commencement of the action, as it was here, the interest runs not from the date of the offer, but from the date of the complaint. The "amount of the judgment" for this purpose is the whole judgment, not just the amount in excess of the offer, and can include any attorneys' fees and even interest awarded as part of the judgment. This mechanism is punitive in nature and the additional award of interest is non-discretionary. *See Boulevard Assoc. v. Sovereign Hotels, Inc.*, 861 F. Supp. 1132, 1141-42 (D. Conn. 1994).

26. In this case, which is already two years old and might not reach verdict for another six months if tried, any verdict in excess of $1.4 million would automatically be

8

increased by 20%. That factor would bring the $2,188,498.70 of the Amended PJR ruling over $2.6 million, and would increase the high end of the verdict range to $9.7 million.

27. Based on the foregoing, there is every reason to conclude that GAI's claims have a high probability of success and a verdict potential far in excess of the compromise amount. It is entirely reasonable to view the Amended PJR ruling, decided on a probable cause standard but reached after eight full days of hotly contested evidentiary hearings, as the best available information on the probabilities. Given that the Amended PJR Ruling omits multiple factors by which GAI could obtain a judgment substantially in excess of the proposed compromise amount, it is also reasonable to conclude that the bulk of uncertainty is on the defense side and in favor of GAI.

28. **As to the complexity and likely duration of litigation**, the docket of the District Court action (entered into evidence at the hearing in this Court on March 31, 2014, as Exhibit GAI-1) provides ample evidence that this has been an exceptionally protracted and complicated case. Both time and complexity have been multiplied by a scorched-earth defense strategy of contesting every issue and pursuing reconsideration and appeal of every adverse decision – which in this case means essentially every decision, because defendants' arguments on the merits and on matters of discovery and procedure have uniformly failed.

29. The conduct of hearings on GAI's PJR application is an apt example. Having suffered an adverse decision after four days of evidence – already an exceptionally extended record on what is ordinarily a summary proceeding – defendants elected to proceed with four more days of evidence, presumably at concomitant expense, only to find themselves with a worse result.

9

30. The record of this bankruptcy proceeding exhibits the same tendencies. As this Court is aware, the debtor devoted an unusual amount of energy to protecting its principals from having to comply with District Court orders directing them to disclose assets and submit them for attachment in Connecticut. This Court rejected their positions in rulings in January and on March 31, 2014, but only after the Court and GAI had been put to considerable trouble to sort out the positions the Court rejected.

31. Continued litigation in the District of Connecticut – which this Court ruled on March 31 could proceed – threatens to continue the same chaotic course. Defendants' current litigation counsel has moved to withdraw. Yet another change of counsel with the attendant process of "getting up to speed," without more, would tend to delay proceedings and subject GAI to yet more duplicative filings. The debtor would incur fees for new counsel to take over the case. And with or without a change of counsel, ongoing litigation costs would further burden the debtor.

32. Continuing litigation in the District of Connecticut also increases the liability exposure. For reasons discussed above, any additional fees incurred by GAI would likely be charged to DSI's account and added to the judgment. The same is true of interest accruing – potentially at multiple levels – between now and judgment. And GAI has multiple theories on which it can recover attorneys' fees (contract, CUTPA and common-law fraud) as well as interest (contract, statute, offer of compromise). In plain words, there is a strong possibility defendants could end up paying GAI's costs as well as their own if they litigate the case and lose.

McKool 985420v2

33. **As to the paramount interest of creditors and proper deference to their views**, it is sufficient that despite having received notice of the proposed compromise, no creditor has objected.

34. The proposed compromise most obviously serves the interests of creditors by preserving DSI as a viable going concern and by freeing DSI's principals to concentrate on the business. In both respects, the parties classified as "creditors" in the bankruptcy setting would simply resume their business relationships, retaining the ability to pursue their rights by litigation or otherwise.

35. Considering the potential for an adverse judgment far in excess of even the amount allowed in the Amended PJR Ruling, the proposed compromise also benefits creditors by liquidating a potentially catastrophic liability at the negotiated settlement amount.

36. **As to whether the proposed compromise is the result of arm's length bargaining,** there will presumably be complete unanimity among the parties to the Connecticut Action. Negotiations reached a successful conclusion only in the day-long settlement conference in New York City on April 7, 2014. The parties had struggled to find common ground over the course of several mediation sessions in the District of Connecticut between the fall of 2012 and September 2013, and GAI had repeatedly been frustrated by what it felt were inadequate and unrealistic settlement positions by the defendants. Their attitude appears to have changed only after exceptionally protracted proceedings in the District of Connecticut and in this Court.

37. The Plude Affidavit, at paragraphs 8-10, provides details as well as GAI's perspective on these exceptionally difficult negotiations, in which both sides were represented by counsel. It also explains Mrs. Plude's decision as GAI's president to accept settlement on the terms now pending approval. Her statements present the classic profile of a real compromise:

McKool 985420v2

GAI is taking less than it thinks DSI should pay, but is willing to do so rather than deal with the further cost and the continued uncertainties and distractions of litigation. No doubt these reactions are mirrored on the DSI side. The Court can be confident that this compromise is the result of open, aggressive negotiations between committed and well-represented adversaries.

38. **As to other factors bearing on the wisdom of the settlement**, GAI would respectfully urge the Court to look at the proposed compromise in light of the tenor of proceedings in this case since its filing on January 14, 2014. With over eighty docket entries on file and no plan of reorganization in prospect, it has finally become apparent to everyone that continued litigation between these parties is not going to yield progress commensurate with effort. GAI respectfully urges the Court to accept the parties' judgment that the negotiated compromise terms represent a fair and reasonable means to put the controversies between them to rest.

Dated: April 25, 2014

          **MCKOOL SMITH P.C.**

By: */s/ Hugh M. Ray, III*
     HUGH M. RAY, III
     State Bar No. 24004246
     600 Travis, Suite 7000
     Houston, Texas 77002
     Telephone: (713) 485-7300
     Facsimile: (713) 485-7344

*Attorneys for Garnet Analytics, Inc.*

-and-

12

Respectfully submitted,

By: */s/Irve Goldman*
    Christopher P. McCormack
    Irve J. Goldman
    Pullman & Comley, LLC
    850 Main Street, P.O. Box 7006
    Bridgeport, CT 06601-7006
    Telephone: (203) 330-2000
    Facsimile: (203) 576-8888
    cmccormack@pullcom.com
    igoldman@pullcom.com

***Attorneys for Garnet Analytics, Inc.***

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 25, 2014, a true and correct copy of this document was served by electronic means on the United States Trustee (as listed on the Court's ECF noticing system) and on the parties shown below, and by first class mail:

Lynn Hamilton Butler, Esq.
Husch Blackwell LLP
111 Congress Ave Ste 1400
Austin, TX 78701

Joseph J. Arcata, III, Esq.
Halloran & Sage LLP
225 Asylum Street
One Goodwin Square
Hartford, CT 06103

                                      */s/ Hugh M. Ray, III*
                                      Hugh M. Ray, III

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | |
| DIVERSIFIED SOLUTIONS, INC.<br>Debtor | § § § | CASE NO. 14-10069<br>Chapter 11 |

**Unsworn Declaration of Denise T. Plude Pursuant to 28 U.S.C. §1746**

1. I make this declaration in further support of the "Amended Expedited Motion to Approve Compromise with Garnet Analytics under Rule 9019" (doc. 79, Apr. 11, 2014). I am over the age of eighteen, I believe in the obligations of an oath, and I have personal knowledge of the matters set forth in this declaration.

2. I am the President of Garnet Analytics, Inc., which is the plaintiff in an action pending in the United States District Court for the District of Connecticut against Diversified Solutions, Inc. and its officers Michael Lundy and Brian Sol, docket number 3:12-CV-00716 (WWE) ("Connecticut Litigation").

3. I am personally familiar with the allegations of GAI's complaint in the Connecticut Litigation, which has been entered into evidence as Exhibit GAI-2 at a hearing in this proceeding on March 31, 2014. Based on my knowledge and the information available to GAI, those allegations are true and correct.

4. Between November 2009 and April 2010, I exchanged a series of emails with Brian Sol of Diversified Solutions, Inc. I did so for the purpose of establishing written terms on which GAI would provide certain services to DSI. In the course of that exchange, Mr. Sol on behalf of DSI proposed certain changes that I accepted on behalf of GAI. True and accurate copies of this email exchange have been entered into evidence as Exhibit GAI-29 at a hearing in this proceeding on March 31, 2014.

5. Following the last email in the series comprising Exhibit GAI-29, sent April 26, 2010, GAI regularly invoiced DSI for services and DSI regularly paid the invoices. In no instance did GAI's invoices provide any detail about hours worked on DSI projects. At no time before late March 2012 did DSI request any such detail. This course of performance continued without interruption until late March 2012.

6. In the Connecticut Litigation, the parties stipulated that GAI performed work for DSI "pursuant to an agreement that GAI would be paid on an hourly basis, with total fees capped at 20% of the payment to DSI from each such client," that until March 28, 2012, "DSI paid GAI's bills without protest" and "did not request detail on time worked by GAI." These stipulations were set forth at page 9 of the "Report of Parties' Planning Conference" (Aug. 3, 2012), a copy of which has been entered into evidence as Exhibit

GAI-10 at a hearing in this proceeding on March 31, 2014. I am personally familiar with these facts and verify that they are as stipulated.

7. In connection with the Connecticut litigation, I have become aware of documents reflecting facts that were withheld from me by DSI in early 2012 and not available when GAI filed its complaint. Specifically, documents disclosed in discovery show that between February 2012 and late March 2012, DSI retained an accounting firm to take over GAI's responsibility, that DSI forwarded GAI's work product to that firm without notice to GAI, and that the replacement firm thereafter used GAI's work product without disclosing its origin. My review of those documents reveals that in multiple instances, the replacement firm and/or DSI altered GAI's documents to conceal their origin.

8. I have personal knowledge of the settlement negotiations between GAI and the defendants in the Connecticut Action. I participated in mediation sessions with Magistrate Judges in the District Court in the fall of 2012 and in September 2013, and I participated in preparing and evaluating settlement proposals exchanged between counsel at other times. I also participated in the final settlement meeting in New York City on April 7, 2014, at which GAI was represented by lead litigation counsel as well as lead and local bankruptcy counsel, and defendants were represented by their lead litigation counsel and DSI's bankruptcy counsel.

9. In the course of those discussions, the defendants consistently offered far less than I felt was appropriate given the amount of work GAI did and the benefit the defendants derived from it. Particularly in discussions before April 7, 2014, Defendants adhered to unreasonable positions even after the District Court ruled against them on GAI's PJR application and numerous other matters. From my perspective, the defendants exhibited real movement only after March 31, 2014, when it became clear that the bankruptcy proceeding would not hold up the Connecticut litigation or excuse them from having to submit assets to secure the increased PJR remedy awarded in December 2013.

10. The decision to accept $2.1 million in settlement of GAI's claims was and is a difficult one. There are good reasons to hold these defendants liable for substantially more. Given the cost and distraction of proceeding, however, I concluded that these terms come close to making GAI whole on reasonable terms, and it is not certain that further effort will yield a better net result. Settlement eliminates the substantial ongoing distraction of the litigation.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on April 25, 2014.

_Denise T. Plude_
Denise T. Plude